**Christopher R. Kelly**
**Gregory R. Bockin\***
**Brendan P. McGlynn\***
**Michael F. McGraw\***
**SECURITIES AND EXCHANGE COMMISSION**
**Philadelphia Regional Office**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA  19103**
KellyCR@sec.gov
**\*Not admitted in the U.S. District Court for the Southern District of New York**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>            **Plaintiff,**<br><br>            **v.**<br><br>**HENRY PAUL REGAN, JR.**<br><br>            **Defendant.** | **25-CV-7343**<br><br><br><u>**COMPLAINT**</u><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendant Henry Paul Regan, Jr. ("Regan" or "Defendant") and alleges as follows:

### <u>SUMMARY</u>

1.      From at least September 2022 to November 2024, Regan fraudulently raised more than $63 million from more than 330 investors through the offer and sale of securities issued by Next Level Holdings LLC ("Next Level") and Yield Wealth Ltd. and Yield Capital Management through The Super High-Yield Term Deposit LP and The Mega High-Yield Term Deposit LP offerings (collectively, "Yield").

2.      Regan claimed to be the Founder and CEO of Next Level and the Co-Founder and Chairman of Yield, and perpetrated this fraudulent scheme by selling Next Level promissory

notes and Yield limited partnership interests that guaranteed annual returns as high as 15.5 percent for 3-to-10-year terms.  Regan communicated materially false and misleading statements concerning the Next Level and Yield securities directly both orally and in writing and indirectly through a network of insurance brokers that he recruited to sell the investments.

3.      Regan stated, among other things, that Next Level would pay the promised returns from profits generated by the purchase and sale of unrefined, Colombian-sourced precious metals.  He further asserted that Yield would pay the promised returns from profits generated by the investment in health insurance policies purportedly issued under the Affordable Care Act and guaranteed by the federal government.  Regan also stated that both investments were fully insured.

4.      Contrary to Regan's representations, the investor proceeds from the Next Level and Yield offerings were not used as promised, but rather were misappropriated by Regan. Moreover, although a small portion of the investments was insured, the vast majority was not. Notwithstanding this, Regan arranged for most investors to receive forged insurance/surety bond agreements or limited partnership agreements containing false insurance guarantees.

5.      As a result, investors in the Next Level and Yield offerings not only did not receive their promised returns, but also suffered significant losses.

6.      By engaging in the conduct described in this Complaint, Defendant violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin such acts, transactions, practices, and courses of business and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

8.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.     Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York.  Among other things, numerous wire and bank account transfers occurred in the Southern District of New York, and a Next Level investor resided in the Southern District of New York.

## DEFENDANT

10.     **Henry Paul Regan, Jr.**, age 48, is a United States citizen who, from at least July 2022, has lived in Colombia.  Regan claimed to be the Founder and CEO of Next Level and the Co-Founder and Chairman of Yield, and controlled and directed the Next Level and Yield offerings.

11.     From 1999 through 2002, Regan was associated with five different registered broker dealers and previously held Series 7 and 63 securities licenses.  On August 3, 2004,

FINRA barred Regan from association with any FINRA member in any capacity for failing to respond to a request for documents and information.

12.    In 2017, Regan pleaded guilty to one count of organized fraud greater than $50,000 in Miami-Dade County Court for the State of Florida in connection with the sale of promissory notes that promised guaranteed returns.  Regan was sentenced to 10 years' probation, which was terminated in 2024.

## OTHER RELEVANT ENTITES

13.    **Next Level Holdings, LLC** has been a Florida limited liability ("LLC") company since January 2016.  Although Next Level's corporate documents list another individual as its sole registered agent, Regan claimed to be the company's Founder and CEO.  Next Level has never been registered with the Commission in any capacity.

14.    **Yield Capital Management, Inc.** ("Yield Capital") is a South Dakota corporation that purported to serve as the Manager for Super High Yield and Mega High Yield. Yield Capital has never been registered with the Commission in any capacity.  Regan claimed to be the Co-Founder and Chairman of Yield.

15.    **Yield Wealth Ltd.** was an SEC-registered investment adviser, although it terminated its registration on September 5, 2024.

16.    **The Super High-Yield Term Deposit LP** ("Super High Yield") is a Delaware limited partnership.  Super High Yield purports to be a private fund offering investors fully insured term deposits with an annual percentage yield of 5.5 to 14 percent.  On April 9, 2024, Super High Yield filed an exempt offering under Regulation D with the Commission.

17.    **The Mega High-Yield Term Deposit LP** ("Mega High Yield") is a Delaware limited partnership.  Mega High Yield purports to be a private fund offering investors fully

insured term deposits with an annual percentage yield of 6.5 to 14 percent.  On April 9, 2024, Mega High Yield filed an exempt offering under Regulation D with the Commission.

18.     **Self-Directed IRA Firm** is a self-directed IRA firm based in Asheville, North Carolina, and its affiliate, which served as the custodian for Next Level and Yield investors who sought to open or roll over existing IRA funds to purchase the promissory note or limited partnership interests in a retirement account.

19.     **Afiancol Colombia S.A.S.** ("Afiancol") is a Bogota, Colombia-based surety bond company.

20.     **Redbridge Insurance Company, Ltd.** ("Redbridge") is a Barbados-based insurance company.

## FACTS

### Background

21.     From at least September 2022 to November 2024, Regan orchestrated a fraudulent scheme in which he raised more than $63 million from more than 330 investors nationwide through the sale of Next Level promissory notes and Yield limited partnership interests.

22.     As the purported Founder and CEO of Next Level and Co-Founder and Chairman of Yield, Regan controlled and directed the offerings.

23.     Regan solicited investors in Next Level and Yield directly and indirectly through a network of at least forty insurance brokers, and paid them sales commissions as high as 15%. Regan directly solicited investors, approved certain marketing materials, recruited and trained U.S.-based insurance brokers to sell the investments, provided scripts for sales calls, and arranged for the custody of investor funds in self-directed individual retirement accounts.

24.     Regan also requested notification when investors wired funds into the accounts and, at the very least in some instances, monitored and accessed the bank accounts that received investor proceeds and wired money and directed when investors were to receive interest and redemption payments drawn on the accounts.

25.     Regan promoted the sale of the Next Level promissory notes issued through Next Level as an "Enhanced Annuity Offering" ("Next Level offering").

26.     Regan promoted the sale of the Yield Capital Management and Yield Wealth Ltd. limited partnership interests as either the "Super High-Yield Term Deposit" or the "Mega High-Yield Term Deposit" ("Yield offering").

27.     Under both offerings, Regan promised "guaranteed" returns ranging from 5.5 to 15.5 percent for terms of 3, 5, 7, or 10 years along with monthly interest payments (in the Next Level offering) and monthly, quarterly, or annual payments (in the Yield offering).

28.     These offerings were passive investments in which the investors were promised returns as a result of the efforts of others.

29.     Regan arranged for Self-Directed IRA Firm to serve as the custodian for investors who sought to open or roll over existing IRA funds to purchase the promissory note or limited partnership interests in a retirement account.

30.     Regardless of whether they were a Next Level investor or Yield investor, almost all investors invested through Self-Directed IRA Firm and were instructed to wire their funds to a Next Level bank account.

### Regan Misled Investors about Next Level's and Yield's
### Business Operations and Use of Investor Proceeds

31.     Through oral and written statements, Regan claimed that Next Level generated revenue to pay the promised returns through its precious metals mining operations.

32.    For instance, in a forty-page Next Level offering document touting the "Enhanced Annuity Offering," Regan claimed:  "This strategy purchases unrefined precious metals from primary local producers and sells them to international refineries / end-users in exchange for a fixed margin" ranging from "**94% to 124%**."

33.    That Next Level offering document was attributed to Regan.  On the penultimate page of the offering document, Regan is identified as the "CEO and founder of Next Level Holdings," and potential investors were invited to "Contact Us" by reaching out to Regan.

34.    Through that Next Level offering document, Regan further stated the company "originates and monitors trade finance in precious metals to support local suppliers" and "export[s] their production to international markets through [Next Level's] bespoke physical trading / operational platform."

35.    In that same document, Regan also represented:  "For investors, these transactions (physical trading) create uncorrelated, highly liquid, fully insured, and guaranteed investment opportunities that aim to generate attractive returns within the physical precious metals sector but without the volatility typically associated with this market; 7 years proven track record."

36.    With respect to Yield, Regan claimed through oral and written statements that Yield generated significant profits from the investment in health care policies issued to individuals pursuant to the Affordable Care Act, which he claimed were guaranteed by the United States Treasury.

37.    Regan explained in various communications with investors and insurance brokers that Yield purchased Affordable Care Act policies from insurance companies for $240 which, in turn, generated guaranteed monthly payments to Yield of $25-$27 on each policy.

38.     According to Regan, this allowed Yield to "service our debt easily and we don't even break a sweat."

39.     Regan's representations as to how the investment funds would be used, and how profits were to be generated, were false and misleading.

40.     The investor funds raised from the Next Level and Yield offerings were not used as promised.

41.     Investor proceeds raised from the Next Level offering were not used to fund mining operations in Colombia, and investor proceeds raised in the Yield offering were not used to purchase Affordable Care Act policies.

42.     Regan knew, or was reckless in not knowing, that the Next Level funds were not used for mining operations in Colombia, and the Yield funds were not used to purchase Affordable Care Act policies.

43.     Instead, Regan misappropriated the Next Level and Yield investor proceeds.

44.     More than $22.6 million was wired to various bank accounts held in the names of two companies that describe themselves as a "broker of electronic items [including] computers [and] iPads" and an "online retail[er of] pet products," respectively.  From these accounts, the majority of investor funds were sent overseas via wire to dozens of companies purporting to be in the import/export business, many of which were based in China, as opposed to supporting Next Level's purported mining operation or Yield's supposed Affordable Care Act investments.

45.     Additionally, approximately $26.2 million of investor proceeds were used in other ways inconsistent with their promised use, including:  (a) interest and redemption payments to investors in the nature of a Ponzi scheme (b) payments to various fintech and/or ecommerce entities; (c) payments to an individual who appears to have participated in marketing the Yield

offering; (d) payments to various law firms; (e) payments to other individuals associated with Next Level or Yield; and (f) lost through stock trading in a Schwab brokerage account held in the name of a Regan associate.

46.     Regan also used approximately $7.8 million of the investor proceeds to pay commissions to his network of insurance brokers for selling the Next Level and Yield investments.

### Regan Falsely Claimed that Next Level and Yield Investments were Protected by Surety Bonds or Insurance

47.     Regan further represented to investors that the principal and interest in both the Next Level and Yield investments were guaranteed by surety bonds or insurance.  Regan directly and indirectly touted these purported protections in communications with prospective investors and in offering materials.

48.     For example, Regan and Next Level offering materials stated that the promissory notes were fully insured by a "noncancelable" surety bond issued by Afiancol, a Bogota, Colombia-based surety bond company.  Regan also stated that Redbridge, an affiliate of Lloyd's of London, agreed to reinsure the surety bond that applied to all of the promissory notes.

49.     As a result, Regan told investors there was: "Full Insurance Protection" for the Next Level offering:  "We are the first and only company in our sector that has been able to secure investment-grade insurers who are removing risk from our investors by issuing financial guarantee insurance to our investors, thereby making our offering essentially risk-free."

50.     Regan told one prospective investor that the insurance policy was "a bulletproof vest" for investors and provided "all the melatonin you could wish for a good night's sleep…enjoying 12-15% in perpetuity every single year."

51.     As for the Yield offering, Regan made similar representations.  The Yield Limited Partnership Agreement stated that a syndicate of "investment-grade rated insurance companies … anchored by Lloyd's of London" had "fully insured to a maximum of $250,000,000" both the principal and promised interest returns.

52.     A Yield offering document further stated:  "**All deposits are fully insured** to a maximum of up to $10 MILLION PER ACCOUNT HOLDER."

53.     The Yield offering document for Mega High Yield further stated:  "This select insurance syndication offers comprehensive investment grade protection for amounts up to $10 million and . . . is provided by highly rated AM Best insurers, including AA++ rated Lloyd's of London, A- rated Fortegra Insurance, A rated Oceanview Reinsurance LTD, and more providing our investors the ultimate in safety, security, protection and peace of mind."

54.     Once a person decided to invest in the Next Level offering, Regan, through Self-Directed IRA Firm, sent investors a "Promissory Note Investment Letter" or a "Secured Promissory Note" issued by Next Level, which detailed the terms of the investment and the monthly interest payment.  Investors in Next Level typically received a "Surety Bond Contract" purportedly issued by Afiancol identifying Next Level as the debtor and the investor as the beneficiary for an amount equal to their investment plus interest.

55.     Investors in the Yield offering received a "Subscription Agreement," which purported to issue limited partnership units to the investor.  The limited partnership agreements in the Yield offering assured investors that their product was insured by "top-rated AM Best Insurance carriers, which are reinsured by Lloyd's of London."

56.     The surety bond contracts typically reflected, among other things, a bond number, and counter signatures of an Afiancol representative and Regan.

57.     Attached to the surety bond contracts was a "Reinsurance Cover Note" on Redbridge Insurance Company, Ltd. letterhead that identified the investor as the beneficiary of the insurance in an amount equal to the investment.  These documents also reflected counter signatures of representatives of Afiancol and Redbridge.

58.     Regan knew, or was reckless in not knowing, that these above statements to prospective investors about the purported insurance coverage for all the Next Level offering and Yield offering were false and misleading.

59.     In reality, Afiancol only had provided insurance for a fraction of the investments. In exchange for counter guarantees from Next Level, Afiancol initially issued surety bonds guaranteeing Next Level's obligations to its earlier investors.  Specifically, Afiancol issued a total of seventy surety bonds to Next Level guaranteeing a total of approximately $7.7 million worth of investments.

60.     Towards the end of 2023, Regan and Next Level requested a substantial increase in the amount guaranteed by Afiancol's surety bonds.  In response, Afiancol requested additional counter-guarantees.

61.     Ultimately, Regan and Next Level did not provide Afiancol with sufficient counter-guarantees, and so Afiancol chose not to issue additional surety bonds.  The last surety bond Afiancol issued was for a Next Level investment that took place at the end of 2023.

62.     Subsequently, Next Level ceased paying for the surety bonds that Afiancol had issued, and Afiancol and Next Level eventually wound up terminating their relationship.  As a result, all of the legitimate surety bonds Afiancol had issued either expired or lapsed for nonpayment by early November 2024.

63.     Notwithstanding the fact that Afiancol had not issued any surety bonds for any investments made after 2023, Regan continued to tout the Next Level and Yield offerings throughout 2024 as being fully insured.  Regan raised more than $50 million based on this false insurance guarantee.

64.     Furthermore, Regan, or others acting at his direction, forged surety bond and reinsurance certificates by taking Afiancol's previously issued surety bonds and Redbridge's reinsurance cover notes, and altering them to change the date, bond numbers, and amounts.

65.     These fake surety bond and reinsurance cover notes gave the false impression that the Next Level and Yield investments were fully guaranteed by third parties when, in reality, they were not.

66.     Regan knew, or was reckless in not knowing, that only a fraction of the investments had insurance coverage, and many of the purported counter signatures of Afiancol and Redbridge on insurance documents that were sent to investors were forged.

**The Fraud Unraveled After Media Scrutiny of the Investment Opportunity**

67.     Beginning in early Fall 2024, the Wall Street Journal published a series of articles focusing on firms offering disproportionately high interest yields in a declining interest rate market and how those firms generated the yield.  The author ultimately discovered the Next Level and Yield offerings and raised questions about the products.

68.      Among other things, the articles reported on the high rates of return, the insurance guarantee, that FINRA previously barred Regan from associating with a broker dealer, and that the insurance brokers selling the securities were not associated with a registered broker-dealer.

69.     The articles ultimately led to a series of communications between and among Regan, the principal of Self-Directed IRA Firm, and several of the insurance brokers who were selling the Next Level and Yield offerings relating to the legitimacy of the investments.

70.     On a September 4, 2024, call with many of the insurance brokers, Regan admitted to fabrications about his resume, that he was barred by FINRA, and that he was "acting out of compliance" with respect to the Yield offering.  However, Regan repeatedly claimed the investments were legitimate and remained secure and that the Wall Street Journal article published as of that time was nothing more than a "hit piece."

71.     During the call, Regan repeatedly made assurances that the Affordable Care Act policies he claimed that Yield had invested in were generating income, that the mining operation that Next Level invested in was legitimate, and that both investments were insured.

72.     Regan knew or was reckless in not knowing that his above statements concerning the use of Next Level and Yield investment proceeds made during the September 4th call were false and misleading.

73.     Despite Regan's assurances, by mid-September 2024, Self-Directed IRA Firm notified Regan that it was ending its relationship with Next Level and Yield.

74.     As a result, on or about September 19, 2024, Regan sent a mass email to investors informing them that Next Level was transitioning to a new custodian, but also misrepresented to investors that their assets were secure and well-managed.

75.     By October, however, the insurance brokers effectively stopped offering the securities.  These events eventually led to the implosion of the fraud.

76.     On or about November 7, 2024, Regan sent an update to investors on the "ongoing custodial matter," which again reiterated "your assets remain secure," but that they

were still "working diligently to resolve the issue."  Regan knew, or was reckless in not knowing, that these statements were false and misleading.

77.    On or about November 15, 2024, Next Level and Yield sent identical emails (except for the entity name) to investors informing them that they had begun "the process of liquidating investments and winding up its affairs."

78.    While neither Next Level nor Yield had any actual investments to liquidate, some investors received payments derived from funds deposited by recent investors in the scheme.

79.    Although the November 15 email promised further updates, Regan ended interest and redemption payments and ceased communicating with investors and the insurance brokers.

80.    Even after factoring in investor payments, Next Level and Yield investors sustained investment losses of approximately $55.9 million.

### Defendant Violated the Federal Securities Laws

81.    The investments in Next Level and Yield offered and sold by Defendant were securities within the meaning of the Securities Act and Exchange Act.

82.    The investments in Next Level and Yield were each offered and sold as a common enterprise with the expectation of profits to be derived solely from the efforts of others.

83.    Investors played no role in the management or operations of the businesses of Next Level or Yield.

84.    Investors provided Regan with money—between at least September 2022 to November 2024, more than 330 individuals invested more than $63 million in the Next Level and Yield offerings.

85.     Investors made their investment with a reasonable expectation of profits to be derived solely from the alleged ability of Next Level and Yield to generate profits without any participation by any of its investors.

86.     Regan engaged in the offer and sale of the securities of Next Level by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

87.     Regan engaged in the offer and sale of the securities of Yield by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

88.     Directly or indirectly, Defendant made materially false and misleading statements concerning the use of investor proceeds and the existence of surety bonds and/or insurance guaranteeing payment on the investments in connection with the Next Level and Yield offerings.

89.     Defendant, directly or indirectly, knowingly or recklessly made material untrue statements concerning the use of investor proceeds and the existence of surety bonds and/or insurance guaranteeing payment on the investments in connection with the Next Level and Yield offerings.

90.     A reasonable investor would consider the misrepresented statements described herein—including, among other information, misrepresentations regarding the use of investors' money and the existence of surety bonds and/or insurance guaranteeing payment on the investments—important in deciding whether or not to purchase the securities.

91.     The untrue statements of material fact and misleading statements described herein were made in the offer or sale of securities.

92.    The untrue statements of material fact and misleading statements described herein were made in connection with the purchase or sale of securities.

93.    Defendant obtained money or property by means of the untrue statements of material fact.

94.    In connection with the conduct described herein, Defendant acted knowingly or recklessly.

95.    Defendant knew or was reckless in not knowing that he was making material misrepresentations.

## FIRST CLAIM FOR RELIEF
### (Violations of Section 17(a) of the Securities Act)

96.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 95, inclusive, as if they were fully set forth herein.

97.    By engaging in the conduct described above, Defendant knowingly or recklessly or, with respect to subparts b and c below, at least negligently, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a.    employed devices, schemes, or artifices to defraud;

b.    obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

98. By engaging in the foregoing conduct, Defendant violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

99. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 95, inclusive, as if they were fully set forth herein.

100. By engaging in the conduct described above, Defendant knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of a national securities exchange:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

101. By engaging in the foregoing conduct, Defendant violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final

judgment:

### I.

Permanently restraining and enjoining Defendant from, directly or indirectly, violating

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by committing or engaging

in specified actions or activities relevant to such violations;

### II.

Permanently enjoining Defendant, directly or indirectly, including, but not limited to,

through any entity owned or controlled by him, from participating in the issuance, purchase,

offer, or sale of any security; provided, however, that such injunction shall not prevent

Defendant from purchasing or selling securities for his personal account;

### III.

Ordering Defendant to disgorge all ill-gotten gains derived from the activities set forth in

this Complaint, together with prejudgment interest thereon;

### IV.

Ordering Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act

[15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78(u)(d)(3)]; and

### V.

Granting such other and further relief as this Court may deem just, equitable, or necessary

in connection with the enforcement of the federal securities laws and for the protection of

investors.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission requests that this case be tried to a jury.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Date:   September 4, 2025

By: *Christopher R. Kelly*

Christopher R. Kelly
Gregory R. Bockin*
Brendan P. McGlynn*
Michael F. McGraw*
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3741 (Kelly)
KellyCR@sec.gov

*Attorneys for Plaintiff*

*Not admitted in the S.D.N.Y.

19